**Steven Ray WYCOFF, Appellant,**

v.

**STATE of Iowa, Appellee.**

**No. 84–160.**

Supreme Court of Iowa.

Feb. 19, 1986.

James P. Cleary, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., Sherie Barnett, Asst. Atty. Gen., and Michael Short, Co. Atty., for appellee.

UHLENHOPP, Justice.

In this further review of a court of appeals decision we consider allegations of prosecutorial misconduct and ineffective assistance of counsel.

Steven Ray Wycoff was convicted of first-degree murder of Cecil Polson, a fellow inmate of Iowa State Penitentiary. Polson died of multiple stab wounds on November 3, 1975.

Attorneys Kent Hutchenson and Gordon Liles were appointed as trial counsel for indigent Wycoff. They divided representation with Hutchenson as lead counsel, though they both participated in examining and objecting during trial.

After sentence, Wycoff appealed and requested new counsel. The request was denied and attorney Liles continued representation. We affirmed in *State v. Wycoff*, 255 N.W.2d 116 (Iowa 1977).

Thereafter different counsel were appointed on several occasions to pursue postconviction relief. In 1981 Wycoff's present counsel was appointed and in March 1982 the initial pleading was filed in this postconviction proceeding.

The present proceeding came on for hearing in February 1983, and trial was completed on May 24, 1983. The postconviction court painstakingly addressed twenty-four issues, and entered its order denying relief on October 31, 1983. Wycoff appealed, and we transferred the appeal to the court of appeals. In the appeal Wycoff argued he was denied his right to a fair trial, due process of law, compulsory process, and effective assistance of counsel, as follows:

(1) the prosecutor improperly cross-examined defense witness Cain, an inmate, without factual predicate and made excuse for the missing predicate in closing argument;

(2) the prosecutor's examination of the victim's wife was designed to inflame and prejudice the jury;

(3) the prosecutor examined two prosecution witnesses regarding threats without factual support;

(4) the prosecutor used false and misleading testimony in an in-court test regarding the presence of blood on a jacket;

(5) the court and counsel by stipulation improperly limited defense witness Tressler's testimony in return for the availability of Tressler to Wycoff for trial;

(6) Wycoff's counsel failed to object to the prosecutor's misconduct relating to cross examination of Cain—due in part to

counsels' conflicting concurrent representation of a possible prosecution rebuttal witness;

(7) his counsel failed to object at trial and failed to appeal as to other prosecutorial misconduct;

(8) his counsel failed to interview and call witnesses with information favorable to his defense;

(9) his counsel failed to request an alibi instruction; and

(10) his counsel acted unprofessionally during readback of testimony and failed to object to the court's admonishment.

In an unpublished decision, the court of appeals reversed:

We find a number of these claimed errors to be without merit. However, we also find significant an error which occurred during trial, which was prejudicial to petitioner. Because of prosecutorial misconduct in making a statement to the jury that prosecutor knew was incorrect, we reverse the trial court.

On further review our review is the same as that of the court of appeals. Because Wycoff raises issues of constitutional magnitude, our task is to evaluate independently the totality of the relevant circumstances. *Taylor v. State*, 352 N.W.2d 683, 684 (Iowa 1984). We give weight to the findings made by the postconviction court regarding the credibility of witnesses. Iowa R.App.P. 14(f)(7); *Taylor*, 352 N.W.2d at 687.

I. *Prosecutorial misconduct.* We first consider Wycoff's right to raise the issues presented. Issues that have been raised, litigated, and adjudicated on direct appeal cannot be relitigated in a postconviction proceeding. Iowa Code § 663A.8 (1985); *Armento v. Baughman*, 290 N.W.2d 11, 12 (Iowa 1980). If issues have not been presented on direct appeal, the petitioner must meet the burden of showing "sufficient reason" for the failure to do so. *Armento*, 290 N.W.2d at 13; *Bledsoe v. State*, 257 N.W.2d 32, 34 (Iowa 1977). To prevail on a prosecutorial misconduct claim, the petitioner must prove

misconduct and that he was prejudiced by it. *State v. Love*, 302 N.W.2d 115, 119 (Iowa 1981).

A. Cross-examination of Cain and argument on rebuttal. Wycoff asserts the prosecutor's cross-examination of defense witness James Cain constituted misconduct. The alleged misconduct involves the following questions and answers by the prosecutor and Cain:

Q. [Mr. Williams, prosecutor] You ever tell anybody that you knew anything about Wycoff having killed Polson? A. No.

Q. You recall a conversation with the correctional officer by the name of Bowen? A. I have a lot—

Q. About your knowledge of the death of Polson? A. No.

Q. You never had a conversation with Kenneth Bowen about Polson's death? A. Yeah. I had conversations with a lot of officers about it.

Q. Tell them you knew who did it? A. No. I don't know who did it.

The prosecutor did not introduce any evidence Cain told Bowen that Cain knew anything about Wycoff having killed Polson.

The State initially argues that this issue was raised and finally adjudicated on direct appeal and is not open for consideration now. Wycoff's brief on direct appeal contained the following argument:

Inmate James Cain was called to testify on behalf of the defendant. On cross-examination of Mr. Cain, Mr. Williams asked Mr. Cain whether Cain had ever told anyone that he (Cain) knew anything about Wycoff having killed Polson. To this, Mr. Cain replied in the negative. (R.p.9) Nowhere else in the record is there any further mention of Mr. Cain's statement, including any rebuttal testimony on behalf of the state. While the defendant is in no manner alleging that Mr. Williams used bad faith in the question to Mr. Cain, its effect upon the jury is the same. The jury could well infer that Mr. Cain did make the statement to that effect to someone else....

We considered this argument on direct appeal and found it without merit. *State v. Wycoff*, 255 N.W.2d 116, 119 (Iowa 1977).

Wycoff contends that this argument on direct appeal was not fully and adequately presented. His present contention is based on trial counsel's failure to object, and on appellate counsel's failure to present certain facts now known. He alleges he should not be barred by this failure, however, because of ineffective counsel and conflict of interest due to Liles' concurrent representation of Bowen in suspension proceedings.

Prosecutor Williams based his cross-examination of Cain on a BCI report allegedly summarizing a conversation between Cain and Bowen as told by Bowen to a BCI agent. The postconviction record reveals Williams relied on the BCI report as the basis of his cross-examination. The report does reflect, through admittedly by double hearsay, a statement by Cain to Bowen that Wycoff was responsible for the stabbing and that the motive was robbery.

Following his cross-examination of Cain in the criminal case, Williams subpoenaed Kenneth Bowen to testify. When Bowen arrived at the courthouse he told Williams he did *not* have a conversation in which Cain told him who was responsible for Polson's murder. He added that he was reluctant to testify because he was currently under suspension from his job at the penitentiary and was fighting disciplinary charges.

Williams did not call Bowen as a witness, nor did he otherwise impeach Cain's denial of the alleged conversation. But neither did he disclose to the court or jury Bowen's denial.

Wycoff argues Williams should have disclosed to the court and jury Bowen's denial regarding such conversation. We agree with the postconviction court that there was nothing in the record necessitating a correction: Cain's undenied testimony in the record was that he did not make such a statement.

William's questions did insinuate Cain made such a statement. William's reliance on an jnadmissible BCI report to lay a foundation for impeachment may in retrospect appear questionable, but we agree with the postconviction court's finding regarding the credibility of Williams and we hold he acted in good faith. He believed that if called, Bowen would substantiate the report. "The authorities generally deny a reversal on the sole ground of such questions unless bad faith of the prosecutor appears." *State v. Love*, 302 N.W.2d 115, 121 (Iowa 1981). This is not a case in which a prosecutor "under the pretense of affecting the credibility of the witness, ... propound[s] interrogatories without any pretense, or [attempts] to establish the truth of the matters suggested by such inquiry, and solely to cast insinuations upon the defendant." *State v. Burris*, 194 Iowa 628, 636, 190 N.W. 38, 41 (1922). Williams did not imply the existence of a factual predicate that he knew he could not support by evidence. *Cf.* ABA Standards, *The Prosecution Function* § 5.7(d), at 98 (Approved Draft 1971). Defense counsel took advantage of the opportunity during closing argument and pointed out William's failure to offer proof of the statement. We do not find prosecutorial misconduct at this point.

Next Wycoff argues Williams amplified and enlarged the "misconduct" in his rebuttal argument to defense attorney Hutchenson's closing argument. Hutchenson argued:

At one place in the testimony of an inmate by the name of Cain, Mr. Williams got into testimony by asking a question, "Didn't you go tell Mr. Bowen about Wycoff, or something about him being involved?" And Mr. Cain's answer was "No."

Now, Mr. Bowen is a guard. If that conversation took place, don't you think that Mr. Bowen should have been subpoenaed and hauled in here and have him repeat that? But he didn't. So Mr. Cain's testimony remains unrefuted;

that he never had that conversation with Mr. Cain [sic].

Williams answered Hutchenson in rebuttal:

He tells you about correctional officer Bowen. He said to you in his closing argument that Bowen is a guard. Ladies and Gentlemen, Mr. Bowen is not a guard anymore. I'm sorry that he wasn't here as a witness. He was subpoenaed. I had hoped he would be cooperative. I'm sorry but he wasn't. But he's not a guard. Mr. Hutchenson knows that. Mr. Hutchenson knows that when he made that statement to you that Bowen is not a guard. He knew that statement was not true. Maybe he meant, though, to say he was a guard but he told you he is a guard. When he told you that, that statement, I guess he was—I could be corrected—he's under suspension. He has disciplinary hearings pending. Maybe technically he is still a guard but certainly not one of the ones that you would normally be thinking of as being a guard.

The court of appeals found Williams' statement in rebuttal constituted prosecutorial misconduct necessitating reversal. It held Williams' comments "implied Bowen would confirm that Cain previously implicated Wycoff and that the only reason Bowen did not appear was because Bowen was uncooperative."

Williams' statement was in response to Hutchenson's reference to Bowen as a guard. Clearly Williams believed this factual inaccuracy aided Hutchenson's argument because a guard would likely have every reason to cooperate with the State. The thrust of Williams' argument was to contradict defense counsel's characterization of Bowen as a guard. While Williams made no attempt to disclose his conversation with Bowen following his examination of Cain, the testimony in question contained only his questions to Cain, made in good faith, and Cain's negative answer.

To the extent Williams' comments arguably implied that Bowen would have testified Cain had implicated Wycoff if Bowen had been cooperative, Wycoff has not es-

tablished that Williams' conduct necessitates a new trial. We allow a prosecutor some leeway when his remarks "are provoked and are offered in retaliation to arguments for the accused." *State v. Wright,* 309 N.W.2d 891, 893 (Iowa 1981). Wycoff cannot have the benefit of the added "punch" of his counsel's reference to Bowen as a guard without running the risk of strong rebuttal. *See State v. Hall,* 235 N.W.2d 702, 728 (Iowa 1975), *cert. denied,* 434 U.S. 822, 98 S.Ct. 66, 54 L.Ed.2d 79 (1977).

We again decline to find that the prosecutor acted in bad faith. He spoke extemporaneously in response to defense counsel's closing argument. The postconviction court found, based on his credibility, that Williams was not deliberately attempting to mislead. Assuming his comments imply Bowen's testimony would contradict Cain, we believe such implication was inadvertent and did not constitute misconduct.

Assuming arguendo that Williams' rebuttal did constitute misconduct, Wycoff has not met his burden of showing he was prejudiced by it. *See State v. Levy,* 160 N.W.2d 460, 467 (Iowa 1968). While the prosecutor's statements may have been unclear as to what Bowen's testimony would have been if he were cooperative, Hutchenson's closing argument clearly contended Bowen must be in agreement with Cain regarding the alleged conversation.

Although Williams went beyond the record in arguing, truthfully, that Bowen was under suspension, a review of the trial transcript convinces us that this incident did not prejudice Wycoff's right to fair trial. Inmates were key witnesses for both the State and defense, and both sides attempted to question the witnesses' motives for testifying. The witnesses' credibility was called into question both generally and specifically. As a result, the physical evidence introduced was convincing and undoubtedly was critical to Wycoff's conviction. While circumstantial in nature, the cumulative physical evidence became too strong for Wycoff's attempted explanations.

**B. Direct examination of victim's wife.** Wycoff alleges prosecutorial misconduct in the direct examination of Mrs. Polson, the victim's wife. Wycoff's counsel did not object on this ground at trial nor raise it on direct appeal. Wycoff asserts that his counsels' ineffective assistance in not objecting is "sufficient reason" for the failure to raise the issue. We address first the misconduct claim.

Williams questioned Mrs. Polson regarding her relationship with her husband and her knowledge of his life in prison. She testified she knew of no problems. She was then asked to identify a photograph of the victim as he appeared after the murder. Upon viewing the picture Mrs. Polson became emotional and cried, necessitating a recess.

Wycoff alleges Williams' questions were deliberately designed to arouse passion and prejudice with the jury. Williams testified at the postconviction hearing the identification questions were an attempt to "humanize Mr. Polson somewhat and allow the jury to recognize him as another member of society for whom somebody cared, rather than just an inmate of the penitentiary as many people feel towards inmates." The postconviction court found Williams' testimony credible, and we defer to that finding. We find no prosecutorial misconduct.

**C. Threat testimony.** Petitioner alleges prosecutorial misconduct in introducing "threat testimony" without factual support. The allegedly improper examination was extracted from two prosecution witnesses who were prison inmates. In examining prosecution witness Garrett, Williams elicited testimony concerning general fears of testifying against a fellow inmate. Garrett also explained that while he didn't know what kind of pressures other inmates were under who testified differently from him, that they could be getting pressure from other inmates. This testimony was not objected to, and in fact on recross-examination Hutchenson inquired whether Wycoff or any of his friends had

threatened Garrett, to which Garrett responded that Wycoff's friends had done so.

Prosecution witness Zacek testified in direct examination his life was in jeopardy. When asked to explain, Zacek responded that "Wycoff got word out"—to which the court sustained a defense hearsay objection. The prosecution then asked Zacek more general questions concerning his apprehension for his safety.

The postconviction court concluded this issue was raised and finally adjudicated on direct appeal adversely to Wycoff. While the issue on direct appeal involved Williams' closing argument, it addressed a very similar issue. Our response is the same as on direct appeal: we do not find the Williams' examination amounted to prosecutorial misconduct.

D. False testing for blood. Wycoff contends his right to fair trial in the criminal prosecution was denied because a test for the presence of blood conducted by a State's expert witness was false and misleading.

During trial a sharply contested issue was the presence of blood on Wycoff's jacket and shoes. The State's expert witness Peterson testified he visually checked the items and then tested suspected areas for the presence of blood. For testing, he cut out the suspected areas of the jacket and attempted to absorb the suspected stain from the shoes. He first conducted a test referred to as a "color test" that presumptively showed the presence of blood by the use of phenolphthalein and benzidine chemical reagents. He then conducted more refined tests to determine whether the blood was human, and its type.

An expert witness for the defense, Simmons, contradicted this testimony, testifying his test results from the use of the presumptive test showed no blood was present. When questioned concerning that test Dr. Simmons testified on cross-examination:

Q. [Mr. Williams] If you had found a suspected stain [by visual examination] upon that jacket, how might you initially have tested to see if it was blood or not?

A. The standard procedure is with phenolphthalein and the other technique is with benzidine, which is not as sensitive.

I should also point out that all tests for blood give you false positive and false negative results; so again, it's important to be able to run controls simultaneously with the test. This is particularly true of benzidine testing while many plants process these chemicals and they can give you false results.

Williams continued to cross-examine Simmons concerning the manner in which the test should be conducted and the use of a swab technique for extracting the stain for testing. Williams then asked:

Q. If there were blood on there [sic] and one were to use the swab technique and it were to read positive, would that be an indication that there were blood there? A. If the test was positive, it would be an indication, certainly.

The State then called Dr. Peterson in rebuttal. Peterson proceeded to conduct the presumptive test in the presence of the jury using the swab technique as described by defense witness Simmons. The test resulted in a positive "presumptive" indication of blood.

It was this test on rebuttal that Wycoff claims was false and misleading. The claim is based on the testimony of still another expert—Dr. Polesky, who testified at the postconviction hearing regarding the tests for the presence of blood conducted by the State's expert: "[t]o imply that this test is specific for blood is somewhat misleading because it is, in my opinion and our routine practice, used as presumptive test, which then requires further steps to identify what your really dealing with."

 Wycoff cites this testimony to establish the misleading nature of the in-court test. He misconstrues the purpose, however, of this test. The testimony and test were introduced to rebut Simmon's testimony that no positive indication of blood was found upon use of the presumptive test. Through examination of Simmons, the State properly laid a foundation

to impeach Simmons' findings. Neither the State nor Peterson misled the jury with the in-court test. All agree that the test is only a presumptive initial test; neither Williams nor Peterson portrayed it in any contrary way. Peterson testified earlier that he had conducted more refined tests.

Wycoff relies heavily on the agreement of the State and Wycoff to have Dr. Polesky test Wycoff's jacket for the presence of blood directly in preparation for the postconviction trial. Polesky's results were inconclusive for the presence of blood. Polesky's testing, however, is not directly related to the issue of misleading test testimony at trial in 1976. Numerous possible explanations exist for the inconclusiveness of the test by Dr. Polesky, including the age of the sample and the numerous tests already conducted. Moreover, the evidence shows a spot of approximately the size of a quarter is necessary to determine conclusively the presence of blood. The experts had cut out as well as swabbed areas, in an effort to get an adequate sample. We are not surprised that no adequate sample was present at the time of the postconviction proceedings.

II. *Limitations on Tressler's testimony.* Harold Tressler was an inmate at Iowa State Penitentiary at the time of the Polson homicide. He was subsequently transferred to a prison in Missouri. Wycoff and his counsel sought to have Tressler subpoenaed as a defense witness at the criminal trial but were precluded by sections 781.14 to 781.16 of the Iowa Code of 1976; the Code then provided that a criminal defendant could not compel attendance of a witness from outside the state. The district court denied an order for Tressler's return but allowed Wycoff's counsel to take Tressler's deposition in Missouri. In the deposition Tressler testified that Mr. Menke, a corrections officer at Iowa State Penitentiary, sold drugs to him at the penitentiary. Tressler further corroborated Wycoff's testimony that a day or two before the murder Tressler injected the drug THC into Wycoff's arm. After the deposition, prosecutor Williams agreed to have Tressler returned to testify for Wycoff.

The postconviction court found that Williams did so because he "became convinced that significant constitutional issues were implicated by the State's refusal to cooperation in Mr. Tressler's return."

Prior to trial the State moved in limine to prevent any reference to Tressler's source of drugs. At the argument on the motion, defense counsel Hutchenson stated, "I don't have any intentions of asking Mr. Tressler where he got the drugs." The court sustained the motion.

Wycoff claims his constitutional right to compulsory process for the attendance of witnesses was denied. He alleges the State required defense counsel to agree not to inquire into Tressler's alleged source of drugs in return for the State's bringing Tressler from Missouri to testify.

Wycoff provides no substantial evidence to support his position. The record of argument on the motion in limine reflecting Hutchenson's intention not to ask the drug question does not establish Wycoff's allegation as he suggests. The postconviction court found the testimony of Hutchenson and Williams—that they did not make such an agreement—was credible and unrefuted. We defer to these determinations.

Hutchenson believed that the evidence was not relevant. He characterized Tressler's testimony as unbelievable and easy to impeach. After consulting co-counsel and Wycoff, Hutchenson decided against recalling Tressler to impeach Menke. We find no merit in the alleged constitutional deprivation.

III. *Ineffective assistance of counsel.* Wycoff contends his counsel was ineffective in several respects. We have stated:

The person claiming that his trial attorney was ineffective, depriving him of his sixth amendment right to counsel, must show that (1) counsel failed to perform an essential duty, and (2) prejudice resulted therefrom. Petitioner has the burden to prove both of these elements by a preponderance of the evidence.

In deciding whether trial counsel's performance was deficient, we require more than a showing that trial strategy backfired or that another attorney would have prepared and tried the case somewhat differently. Petitioner must overcome a presumption that counsel is competent.... The ultimate test is whether under the entire record and totality of the circumstances counsel's performance was within the range of normal competency.

*Taylor v. State*, 352 N.W.2d 683, 684-85 (Iowa 1984) (citations omitted).

■ A. Failure to object to prosecutorial misconduct. As we have concluded in division I that no prosecutorial misconduct prejudiced Wycoff in his criminal trial, we find the claim of ineffective counsel in failing to object to those claimed offenses to be moot.

B. Concurrent representation by counsel. Wycoff claims that Attorneys Hutchenson and Liles' concurrent representation of correctional officer Bowen and himself amounted to a conflict of interest that prejudiced him. Specifically Wycoff argues that this concurrent representation was the cause of his attorneys' failure to object to Williams' "improper" examination of Cain.

In fact, the evidence reflects that attorney Liles represented Bowen concerning the disciplinary matter. Hutchenson was Liles' partner at the time and may have met or conversed with Bowen, but Hutchenson did not represent him. Liles was not present at trial during Cain's testimony.

■ We are aware of the possibility of prejudice to criminal defendants in concurrent representation situations. *See Nichol v. State*, 309 N.W.2d 468, 470 (Iowa 1981); *Cosgrove v. State*, 304 N.W.2d 184, 187 (Iowa 1981). If a petitioner has established that his attorney had an attorney-client relationship with an adverse party or witness, he need only show a substantial possibility of a conflict of interest to claim a denial of effective assistance of counsel. *Cosgrove*, 304 N.W.2d at 187.

In this situation, however, Bowen was not a witness for the prosecution. Prosecutor Williams subpoenaed Bowen as a rebuttal witness, to impeach Cain's testimony. When Bowen denied the statement referred to in the BCI report, Williams told him he was no longer needed. Thus as a potential prosecution witness, Liles' representation of Bowen did not prejudice Wycoff.

■ Wycoff argues that he was nonetheless prejudiced because Liles' representation of Bowen was the cause of Hutchenson's failure to object to the cross-examination of Cain. As we understand his argument, Wycoff asserts his counsel should have objected to the questions of Cain regarding an alleged conversation with Bowen. Wycoff's attorneys were aware Bowen denied knowledge of the conversation, though no evidence appears that they were aware of what Bowen told Williams when subpoenaed. Wycoff alleges an objection would have revealed their representation of Bowen, and the prosecutor's mistake as to what Bowen would testify. Wycoff opines that Hutchenson's failure to object was due to his protection of Bowen's interests. He asserts that an objection and possible testimony by Bowen would have been harmful to Bowen in Bowen's disciplinary proceeding.

Hutchenson's explanation of his failure to object was not favoritism to Bowen, but tactics. Cain had answered Williams' original question in the negative, and such was the only testimony on that point. Hutchenson's belief was that involving Bowen in the fray would only magnify the matter and perhaps result in a worse record for Wycoff.

In any event, Wycoff did not establish that the Cain incident—both the cross-examination and the jury argument—was of sufficient magnitude in this lengthy and hotly contested trial to prejudice Wycoff.

C. Counsel's failure to interview and call witnesses. Elmer Cartee and Patrick Russell, inmates at the penitentiary at the time of the Polson homicide, were not called as witnesses for Wycoff. In the

present proceeding Wycoff contends that if they had been called they would have testified as to state witness Garrett's motive for testifying against Wycoff. In addition, Wycoff claims Hutchenson received a letter from Russell dated February 15, 1976, stating he had information beneficial to Wycoff's defense.

Defense attorney Liles was assigned the task of initial investigation and interview of potential witnesses. While he has no present recollection of interviewing Cartee and Russell, substantial evidence indicates he did so on February 11, 1976. Liles secured a list of inmates housed on "Q" and "R" Ranges of Cellhouse 18, where the homicide occurred. Prison visitation records indicate that Liles signed in to visit Russell on February 11, 1976. Liles also recorded his interview with Cartee and Russell in a sworn claim for attorney's fees filed March 12, 1976. Liles filled out his records carefully. We conclude Liles did interview Cartee and Russell on February 11, 1976. We are not willing to presume he obtained helpful testimony from them but did not use it.

The letter received by Hutchenson following Liles' interview did not explain the information Russell claimed to possess. Beyond the letter, neither Cartee nor Russell attempted any communication regarding the alleged information. Both testified before the grand jury that they had no knowledge of a motive for the killing of Polson, nor did they know who might have killed him. The postconviction trial court did not find credible the testimony of Cartee and Russell as to what their testimony would have been if they had been called in Wycoff's criminal trial. We give weight to the court's findings regarding credibility. Iowa R.App.P. 14(f)(7).

We find no merit to the claim that counsel were ineffective for failure to re-interview witnesses.

D. Counsel's failure to request alibi instruction. Wycoff alleges counsel's failure to file notice of alibi defense and to request

an alibi instruction constituted a denial of his right to effective assistance of counsel.

An alibi defense is used where

a defendant is attempting to prove not only that he was not present, but that he was at another place so remote or under such circumstances that he could not have been present. *Unless a defendant is attempting to show the practical impossibility of his presence at the scene of the crime, he is not setting up alibi....*

*State v. Dunne,* 234 Iowa 1185, 1191–92, 15 N.W.2d 296, 300 (1944) (emphasis added).

Hutchenson testified at the postconviction trial that he did not request the instruction because all the evidence placed Wycoff in cellhouse 18 at the time of the murder. His general belief was that the specific alibi instruction was more applicable to the situation where "they've got him accused of a crime in Des Moines and he is actually in Atlanta." The State had the obligation to prove the defendant was present under its theory that Wycoff committed the murder. *See State v. Sallis,* 238 N.W.2d 799, 801 (Iowa 1976). From the whole of counsel's testimony we conclude his decision not to request an alibi instruction was based on his general strategy regarding Wycoff's defense of attempting to disprove the State's evidence by showing the unlikelihood that Wycoff, although present in the cellhouse, murdered Polson.

As a legal proposition, the instruction may have been available in Wycoff's case, but "not every right to insist that a particular instruction be given need be availed of by counsel in order to satisfy the standard of normal competency." *State v. Blackford,* 335 N.W.2d 173, 178 (Iowa 1983); *see Lamphere v. State,* 348 N.W.2d 212, 217 (Iowa 1984).

E. Counsel's "unprofessional" conduct. Wycoff complains that his counsel acted unprofessionally in the jury's presence resulting in an admonishment by the court. We find Wycoff's argument without merit.

Following submission of the case to the jury Wycoff and his counsel were called to the courthouse for a read-back of testimony. Hutchenson had been to dinner with his wife, and admittedly drank two martinis. Alcohol could be detected on Hutchenson's breath, and his complexion was "ruddy." During the read-back, Hutchenson was seated in a squeaky chair. He rocked his chair slightly while concentrating on the testimony being re-read. The squeaking became a bit annoying, and the court called Mr. Hutchenson's name to break his concentration.

Wycoff's amplification of this insignificant incident into a claim of unprofessional conduct is not warranted by the evidence. No evidence indicates that Hutchenson was intoxicated, nor does any evidence appear that his rocking or the court's "admonishment" was in any way due to the influence of alcohol.

Furthermore, the judge's calling Hutchenson's name did not amount to an admonishment. According to the court reporter's testimony, the court did not speak loudly or harshly. No indication appears that any juror reacted adversely. No objection at the time by Wycoff's counsel was in order.

F. *Failure to object and raise on appeal.* Having addressed all issues on the merits we find no viable claim of ineffectiveness of counsel due to failure to object or raise issues on appeal.

G. *Totality of circumstances.* No specific error or conduct of trial or appellate counsel amounted to ineffective assistance of counsel. Combined acts or errors may, however, violate the sixth amendment right. *See Harris v. Housewright,* 697 F.2d 202, 206 (8th Cir.1982). We view the totality of the circumstances to determine whether counsel's representation was "within the range of normal competency." *Henderson v. Scurr,* 313 N.W.2d 522, 524 (Iowa 1981). Applying this test we find Wycoff's trial and appellate counsel's performance was within the normal range. The State presented a strong case of guilt, defense counsel thoroughly and vigorously defended Wycoff, the alleged shortcomings

appear from hindsight, and we hold that the guilty verdict and the sentence should stand.

DECISION OF COURT OF APPEALS VACATED, JUDGMENT OF DISTRICT COURT AFFIRMED.

All Justices concur except LAVORATO, J., who takes no part.